IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| TAMMY L. TAYLOR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.  05-1300-WEB |
| ) | |
| HOME DEPOT USA, INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**<u>Memorandum and Order</u>**

Plaintiff Tammy Taylor filed this action claiming that defendant Home Depot, her former employer, terminated her employment in violation of an implied contract of employment and in retaliation for reporting improper activities.  Jurisdiction in this court is based upon diversity of citizenship.  28 U.S.C. § 1332.  The matter is now before the court on the defendant's motion for summary judgment.  The court finds that oral argument would not assist in deciding the issues presented.

I. *<u>Facts</u>*.

In accordance with the standards of Fed.R.Civ.P. 56(c) and D.Kan.R. 56.1, the court finds the following facts to be uncontroverted for purposes of summary judgment.

1. Plaintiff worked for Home Depot from February 8, 1999, until April 11, 2005. (Deposition of Tammy Taylor, Ex. A, pp. 14-15).

2. Plaintiff became a scheduler at Home Depot's store in East Wichita on September 26, 2002. (Plaintiff's Dep., Ex. A, p. 15).

3. Eli Jantz, Human Resource Manager, supervised plaintiff in her position of scheduler.

(Plaintiff's Dep., Ex. A, p. 15; Jantz Aff., Ex. G, ¶ 2).

4. Plaintiff's first job with Home Depot was as a cashier. (Plaintiff's Dep., Ex. A, p. 17).

5. When plaintiff began her employment with Home Depot, she signed an acknowledgment form indicating she had received Home Depot's handbook. (Plaintiff's Answers to Request for Admissions, Ex. B, No. 33; Plaintiff's Acknowledgment Form, Ex. C).

6. The Associate Acknowledgment Form signed by plaintiff provides, in part: "neither the Handbook or any provisions of the Handbook is an employment contract or any other type of contract." (Plaintiff's RFA Answers, Ex. B, No. 35; Acknowledgment Form, Ex. C).

7. The Associate Acknowledgment Form signed by plaintiff in 1999 further provides, in part: "I understand that my employment will be for no definite term, such that I will enjoy the right to terminate my employment at any time, at my convenience, with or without cause or reason. I further understand that Home Depot U.S.A., Inc. will have the same right. This status can only be modified if such modification is in writing and signed by both me and the President of the Company." (Plaintiff's RFA Answers, Ex. B, No. 36; Acknowledgment Form, Ex. C).

8. Plaintiff possesses nothing in writing signed by herself and the President of Home Depot or any other corporate officer or representative that indicates she has an employment contract with Home Depot. (Plaintiff's RFA Answers, Ex. B, No. 38; Plaintiff's Dep., Ex. A, pp. 16-17).

9. Plaintiff did not draft, prepare or negotiate any of the associate orientation materials, including the handbooks. (Plaintiff's Dep., Ex. A, pp. 76-78).

10. During the time of plaintiff's employment with Home Depot, plaintiff could resign her employment at any time with notice to the company. (Plaintiff's RFA Answers, Ex. B, No. 1; Home Depot Policies, Ex. N; Plaintiff's Dep., Exh. A, at 41).

11. During the time of plaintiff's employment with Home Depot, plaintiff was aware of at

least one or more employees who voluntarily resigned his/her/their employment with Home Depot. (Plaintiff's RFA Answers, Ex. B, No. 3).

12. On October 26, 2002, plaintiff signed that she acknowledged that she had read the job description and requirements for the Scheduler/Writer position, and certified she could perform the functions of the Scheduler/Writer position. (Plaintiff's RFA Answers, Ex. B, No. 32).

13. Plaintiff received nothing of monetary value in terms of consideration for entering her employment with Home Depot. She was only paid for hours she actually logged working on the clock.  Her compensation included health insurance benefits, pension benefits, stock options, a 401(k), and bonuses.  (Plaintiff's Dep., Ex. A, pp. 80-81).

14. Plaintiff intended to retire from Home Depot, probably in her 60's. Plaintiff was in her 30's when she began working for Home Depot in 1999. (Plaintiff's Dep., Ex. A, pp. 82-83).

15. During plaintiff's interview with Home Depot, plaintiff claims there was a discussion about longevity and career possibilities with Home Depot, specifically that there was a lot of room for growth and a career with Home Depot was definitely possible; and that they like to try and keep their employees because it is just a better business practice to try and develop and keep their employees for a longer term. (Plaintiff's Dep., Ex. A, pp. 17-20).

16. During the interview process, plaintiff believed her job with Home Depot was secure so long as she did not do anything like steal or kill somebody or threaten to do harm to somebody. This belief was based in part on the interviewer's question of where plaintiff thought she would be or where she wanted to be in the future and the interviewer's response that retiring from Home Depot was a definite possibility and that they believed in long-term career opportunities and development. (Plaintiff's Dep., Ex. A, pp. 20-21).

17. There was no discussion during the interview process about termination without

discipline or only being terminated with discipline prior to termination.  According to plaintiff there was no discussion of termination at all.  (Plaintiff's Dep., Ex. A, pp. 20-22, 23).

18. Plaintiff believes she was only an at-will employee only during the first 90-day probationary period. (Plaintiff's Dep., Ex. A, pp. 222-224).

19. Plaintiff had discussions regarding the scheduler position with Eli Jantz, in which they discussed longevity with Home Depot. (Plaintiff's Dep., Ex. A, pp. 24-33).

20. Eli Jantz never promised plaintiff long-term employment with the company and never promised plaintiff that she could only be terminated if she was first afforded certain discipline. (Jantz Aff., Ex. G, ¶ 11, 12).

21. No member of management, including any District Manager, Store Manager, Human Resource Manager, Assistant Store Manager, trainer, orientation trainer or supervisor, had authority to or did promise plaintiff long-term employment with Home Depot. (Gaskill Aff., Ex. J, ¶ 7; Jantz Aff., Ex. G, ¶ 11-12; Polzin Aff., Ex. I, ¶ 6).

22. Plaintiff was never told that she had an employment contract with Home Depot. (Plaintiff's Dep., Ex. A, pp. 73-74).

23. Plaintiff understood that a major work violation could result in immediate termination. (Plaintiff's Dep., Ex. A, p. 75-76; Code of Conduct, Ex. M).

24. Plaintiff believes there was a three-step policy in place that had to be followed prior to a termination for minor work-rule violations. (Plaintiff's Dep., Ex. A, p. 79).

25. Plaintiff attended group orientation training after she was already employed. This training included discussion regarding discipline which plaintiff relies on as one basis for her claim that she had an implied contract of employment. (Plaintiff's Dep., Ex. A, pp. 39-40).

26. The orientation trainer, R.D. Kuntz, according to plaintiff, covered thoroughly the

disciplinary process that Home Depot had in place, including a three-step disciplinary process. This training was part of the orientation meeting at Store #2202 in Merriam, Kansas after plaintiff became a Home Depot employee. Other employees attended the same orientation training with plaintiff. (Plaintiff's Dep., Ex. A, pp. 39-41).

27. Plaintiff relies on other orientation training discussions she heard as part of group training she received after she was already an employee. The other training discussion upon which plaintiff relies include that the associates were welcomed; there was discussion about long-term career opportunities, commitments, and development; and discussion about the importance of Home Depot associates and retaining those associates. (Plaintiff's Dep., Ex. A, pp. 43-44).

28. Plaintiff also relies on training she received as a head cashier and front-end supervisor training – although she was never a front-end supervisor – as part of the basis of her claim of implied contract. (Plaintiff's Dep., Ex. A, pp. 45, 50-51) Specifically, plaintiff relies on in-depth discussions of the three-step disciplinary process during these training sessions as the basis of her belief that she had an implied contract of employment with Home Depot. (Plaintiff's Dep., Ex. A, pp. 45, 46-49, 51).

29. As part of plaintiff's claim that she had an implied contract of employment with Home Depot, she also relies on discussions she had with or in the presence of managers stating they needed documentation before terminating an employee. (Plaintiff's Dep., Ex. A, pp. 36-38) Many conversations plaintiff was privy to dealt with the treatment of other employees or associates. (Plaintiff's Dep., Ex. A, p. 54).

30. Every time plaintiff heard the three-step disciplinary process mentioned it was either in a training class with a group of employees or it was with respect to other associates or other managers. (Plaintiff's Dep., Ex. A, pp. 55-56, 64).

31. Specifically,  plaintiff had conversations with, or heard conversations from, store manager Bill Polzin generally involving the fact that Mr. Polzin's hands were tied because he could not do anything about complaints if his managers had not documented incidents about their associates. (Plaintiff's Dep., Ex. A, pp. 58-61).  Polzin complained that he would call the district manager or district human resources manager about problem associated and ask what he could do, and he would be instructed that he had to have documentation before he could terminate them. Plaintiff's Dep., Exh. A, at 64.

32. Plaintiff relies on conversations in her presence by Bill Polzin about other associates or managers regarding the need for documentation before he could terminate them. Polzin would say there had to be prior documentation in their file in a general sense. (Plaintiff's Dep., Ex. A, pp. 64-66).

33. Plaintiff also relies on things she would hear Eli Jantz say about his frustrations about management not wanting to follow the policy and not following the disciplinary process they had in place, and that they needed to counsel associates and put written documentation in their files if they had problems. (Plaintiff's Dep., Ex. A, pp. 67-68).

34. Plaintiff was never privy to see personnel files of other associates. Her testimony about the need for "documentation" in the files was based on what was communicated to her, not on anything she saw in anyone's personnel file. (Plaintiff's Dep., Ex. A, pp. 71-73).

35. Home Depot's 1999 Associate Orientation Guide defines its Employment At Will Policy as follows:

As an associate of Home Depot, your employment is for no specific period of time, and you have the right to terminate your employment at any time, at your convenience, with or without cause or reason. Home Depot also has the same right. This status can only be modified if the modification is stated in writing in a document that is signed by both you and the CEO or Group President of the Company.

(1999 Associate Orientation Guide, Ex. N, p. 74) The Guide further recognizes that termination "occurs immediately for serious misconduct". (1999 Associate Orientation Guide, Ex. N, p. 84).

36. Home Depot's 2002 Associate Orientation Guide defines its Employment At Will Policy as follows:

As an associate of Home Depot, your employment is for no specific period of time, and you have the right to terminate your employment at any time, at your convenience, with or without cause or reason. Home Depot also has the same right. This status can only be modified if the modification is stated in writing in a document that is signed by both you and the CEO or Division President of the Company.

(2002 Associate Orientation Guide, Ex. N, p. 92) Home Depot's disciplinary policy further provides:

The goal of associate discipline is to communicate to associates the Company's standards of performance and conduct. While there are several forms of discipline, the Company has the sole discretion to determine the appropriate form of corrective action in any particular situation. This includes the right of the Company to terminate an associate's employment without prior counseling.

(2002 Associate Orientation Guide, Ex. N, p. 77).

37. Home Depot's Code of Conduct includes a provision on acting with integrity and honesty, which provides:

The Home Depot expects all associates to act with integrity and honesty in all matters related to Company business. Associates may not obtain or use any property or services of the Company, fellow associates, or customers, visitors or vendors in a manner other than that authorized by Company policy or by federal, state or local laws.

The Code of Conduct, under the heading Major Work Rule Violations, further sets forth examples of prohibited conduct "that will normally result in termination for a first offense," which include:

Act with Integrity and Honesty
****
• Falsifying a company document or a document relied upon by the Company, by including false information or by knowingly omitting relevant information
• Altering, falsifying, destroying or misusing any employment documentation including computerized materials and time clock records
****
• Participating in or inappropriately influencing a transaction between Home Depot and another individual or organization when self-interest is involved; any situation where a conflict of interest exists between the Company's interests and an associate's personal interests (i.e. soliciting work

from customers for personal gain).  (Code of Conduct, Ex. M).

38. Plaintiff relies on Home Depot's policies regarding three-step discipline, taking care of people, open door, longevity benefits, and its union-free philosophy for her claim of an implied contract with Home Depot.  She also relies upon Home Depot's statements that it intended to provide growth and advancement opportunities and that it wanted to retain its employees, and her understanding that "that was the entire foundation for Home Depot, was their core values," (Plaintiff's Dep., Ex. A, pp. 182, 317-325; Ex. N, pp. 18, 80, 84, 123).

39. Home Depot claims it had a good faith belief and opinion that Ms. Taylor had committed a major work rule violation by falsely providing information concerning another associate's request for time off and her husband's alleged time off, which resulted in its opinion that she had violated integrity and honesty provisions of the Code of Conduct by improperly favoring her husband in her role as a scheduler. (Jantz Aff., Ex. H, ¶ 10; Plaintiff's separation form, Ex. L; Polzin Aff., Ex. I, ¶ 4; Gaskill Aff., Ex. J, ¶ 2).[1]

40. Eli Jantz had prior discussions with plaintiff about the perception of favoritism and not favoring her husband or others in her role as scheduler. (Jantz Aff., Ex. G, ¶ 13, 14; Plaintiff's Review attached as exhibit G-1 to Jantz Aff., Ex. G).

41. Plaintiff believed she was terminated from her employment with Home Depot in April 2005, as retaliation for cooperating in an investigation against management and as a result of personal retaliation against her by Eli Jantz. (Plaintiff's Dep., Ex. A, pp. 83-84).

42. The decision to terminate plaintiff's employment had no connection to any concerns she

---

[1] Plaintiff attempts to controvert this statement by citing to a portion of her deposition testimony, however she has not provided the court with the deposition excerpt.  In any event, defendant has moved for summary judgment only on the issue of whether there was an implied contract, so any dispute about whether Home Depot had a good faith basis for terminating her employment is immaterial insofar as the instant motion is concerned.  *See* Doc. 45-1 at 20.

may have voiced about Brian Baldry or anyone else at any time and had no connection to any information she may have provided to the DLPM as part of an investigation. (Jantz Aff., Ex. H, ¶ 8, 9; Polzin Aff., Ex. I, ¶ 2, 3; Gaskill Aff., Ex. J, ¶ 3-5; Mead Aff., Ex. K, ¶ 6-8).

43. In approximately March, 2005, district loss prevention manager Lynn Mead asked plaintiff to gather copies of manager's schedules for certain dates and asked plaintiff if she could use plaintiff's printer to print certain documents because she did not have a printer in the loss prevention office at Store # 2204. (Plaintiff's Dep., Ex. A, pp. 84-85; Mead Aff., Ex. K, ¶ 2, 3, 5).

44. Specifically, Lynn Mead asked plaintiff to pull the manager's schedules because she was conducting an investigation. (Plaintiff's Dep., Ex. A, p. 86; Mead Aff., Ex. K, ¶ 3).

45. Lynn Mead, the DLPM, was investigating the way a manager had purchased a blower at Store # 2204 to determine whether the purchase violated store policy. Mead did not find any violation of store policy as a result of the investigation. (Mead Aff., Ex. K, ¶ 2, 9).

46. In response to Lynn Mead's request, plaintiff pulled schedules of six individuals who were salaried managers in the store and provided those to Lynn Mead. (Plaintiff's Dep., Ex. A, pp. 86-87; Mead Aff., Ex. K, ¶ 5).

47. Plaintiff never provided a statement or complaint to Lynn Mead as part of her investigation; the only information plaintiff provided to Lynn Mead was at Mead's request and included the schedules and documents Mead printed to plaintiff's printer. (Mead Aff., Ex. K, ¶ 3, 5).

48. Plaintiff believed that Lynn Mead's investigation included Brian Baldry and some others. (Plaintiff's Dep., Ex. A, pp. 88-90).

49. DLPM Lynn Mead never identified the name of anyone who was the subject of her investigation. (Plaintiff's Dep., Ex. A, pp. 88-89; Mead Aff., Ex. K, ¶ 4).

50. Plaintiff's information about the subject of Lynn Mead's investigation came from one comment from Dennis Araujo, a Loss Prevention associate, who indicated the investigation involved Brian Baldry and some others not specifically mentioned by name. (Plaintiff's Dep., Ex. A, pp. 89-91).

51. Plaintiff has no way of knowing whether Lynn Mead's investigation involved Eli Jantz in any way. (Plaintiff's Dep., Ex. A, p. 91).

52. Lynn Mead's investigation in no way involved Eli Jantz. (Mead Aff., Ex. K, ¶ 9).

53. Plaintiff has no way of knowing whether Lynn Mead ever discussed this particular investigation with Eli Jantz prior to Eli Jantz deciding to terminate plaintiff's employment. (Plaintiff's Dep., Ex. A, pp. 91-92).

54. Eli Jantz had no knowledge that plaintiff provided Lynn Mead with any information as part of an investigation prior to plaintiff's termination of employment. (Jantz Aff., Ex. G, ¶ 3; Mead Aff., Ex. K, ¶ 7).

55. Plaintiff has no way of knowing whether Lynn Mead discussed the investigation with Bill Polzin prior to plaintiff's termination of employment. (Plaintiff's Dep., Ex. A, pp. 92-93).

56. Bill Polzin and Rick Gaskill had no knowledge of Lynn Mead's investigation and had no knowledge of plaintiff providing information to Lynn Mead as part of the investigation prior to plaintiff's termination of employment. (Polzin Aff., Ex. I, ¶ 2-3; Gaskill Aff., Ex. J, ¶ 3-5).

57. Plaintiff has no way of knowing whether Eli Jantz communicated with anyone in Home Depot management regarding her termination of employment prior to her termination meeting on April 11, 2005. (Plaintiff's Dep., Ex. A, p. 106).

58. Bill Polzin, Eli Jantz and Rick Gaskill were involved in the decision to termination plaintiff's employment. (Polzin Aff., Ex. I, ¶ 4; Jantz Aff., Ex. G, ¶10; Gaskill Aff., Ex. J, ¶ 2).

59. Plaintiff never thought Eli Jantz was violating a Home Depot policy. (Plaintiff's Dep., Ex. A, p. 149).

60. Plaintiff never reported Eli Jantz to law enforcement for any reason. (Plaintiff's Dep., Ex. A, p. 149).

61. Plaintiff never reported a concern or complaint that involved a violation of rule, regulation or law pertaining to the health, safety or general welfare of the public. (Baldry Aff., Ex. E, ¶ 5; Jantz Aff., Ex. G, ¶ 17; Polzin Aff., Ex. I, ¶ 5; Gaskill Aff., Ex. J, ¶ 8; Mead Aff., Ex. K, ¶ 10).

62. Plaintiff believes she was personally retaliated against by Eli Jantz, because she indicated to Jantz that she did not want to do personal things for him and because she thought Jantz and Baldry were friends and that Jantz knew that the DLPM's investigation was about Baldry. (Plaintiff's Dep., Ex. A, pp. 129-31).

At some point in 2005, plaintiff told Jantz that she would no longer watch his kids for him at work or take him to pick up his car.  Plaintiff's Dep., Exh. A, at 119-21.

63. Plaintiff believes that Eli Jantz and Brian Baldry were friends and that Jantz may have been upset either about plaintiff's complaints concerning Brian Baldry or the investigation of which Brian Baldry was a subject. (Plaintiff's Dep., Ex. A, pp. 130-31, 184-193).

64. Plaintiff claims that Eli Jantz asked her to take additional job responsibilities. (Plaintiff's Dep., Ex. A, pp. 127-28) Among other things, plaintiff claims that Eli Jantz asked plaintiff to watch his kids on several occasions and that she told Eli Jantz in not so many words that she did not want to do this. (Plaintiff's Dep., Ex. A, pp. 119-120, 126-29).

65. Plaintiff made several complaints to Eli Jantz and/or Bill Polzin about Brian Baldry and his demeanor and the way he communicated with her. Plaintiff's concerns did not involve sexual

harassment or any type of sexual touching. (Plaintiff's Dep., Ex. A, pp. 185-86; Jantz Aff., Ex. G, ¶ 6).

Baldry got upset with plaintiff for utilizing Home Depot's "open door" policy that allowed employees to talk to any manager about problems without fear of retaliation.  Plaintiff testified that Baldry told plaintiff she had overstepped by doing so;  he got in her face and was loud about it. Plaintiff's Dep., Exh. A, at 183-86.

66. Jantz told plaintiff that he would take care of it; plaintiff was aware that Jantz had spoken to Baldry about the way he communicated with plaintiff; and Baldry never interacted with plaintiff the same way again. (Plaintiff's Dep., Ex. A, pp. 187-88; Jantz Aff., Ex. G, ¶ 7) Plaintiff was never disciplined for any interaction or communication she had with Baldry. (Plaintiff's Dep., Ex. A, pp. 190-91).

67. Eli Jantz is not personal friends with Brian Baldry and disciplined Brian Baldry for the way he had spoken with associates, including after he received a concern from plaintiff about the way Brian Baldry had interacted with plaintiff. (Jantz Aff., Ex. G, ¶ 7, 8; Baldry Aff., Ex. E, ¶ 3).

68. Brian Baldry voluntarily resigned his employment with Home Depot to purse a different career opportunity. Mr. Baldry was not asked to resign his employment. (Affidavit of Baldry Aff., Ex. E, ¶ 2; separation document for Brian Baldry, Ex. F; Jantz Aff., Ex. G, ¶16; Gaskill Aff., Ex. J, ¶ 6).

69. Eli Jantz voluntarily resigned his employment with Home Depot to pursue a different employment opportunity. Jantz was not asked to resign his employment. (Jantz Aff., Ex. G, ¶15; Jantz resignation letter, Ex. H, Gaskill Aff., Ex. J, ¶ 6).

70. Following plaintiff's separation of employment, she found employment with the American Red Cross and was hired effective September 26, 2005. (Plaintiff's Dep., Ex. A, p. 174).

71. Plaintiff worked approximately 30 hours per week with the American Red Cross making $12.40 per hour from September 26, 2005, until January 9, 2006. (Plaintiff's Dep., Ex. A, pp. 175-176).

72. On January 9, 2006, plaintiff began working approximately 40 hours per week with the American Red Cross making $12.40 per hour. (Plaintiff's Dep., Ex. A, p. 176).

73. Plaintiff has been eligible for benefits since she began her employment with the American Red Cross on September 26, 2005. (September 20, 2005, offer letter from the American Red Cross, Ex. D).

*Plaintiff's Additional Statement of Facts*.

As defendant points out, plaintiff's statement of additional facts does not comply with D.Kan.R. 56(b), which requires each additional statement to be set forth in a separately numbered paragraph and supported by a citation to the record.  Plaintiff has instead provided a narrative statement with periodic references to the record.  Some of these references are to large blocks of testimony, e.g. "Tammy Taylor, pps. 83-91; 118-29."  Additionally, some of the citations refer to testimony or other exhibits that have not been provided to the court.  This manner of briefing makes it difficult for the court to ascertain whether the statements are actually supported by evidence in the record.  The court will address plaintiff's additional statement to the best of its ability, but matters which the court cannot confirm to be supported by evidence in the record will be excluded from the following statement of facts.

Plaintiff started work for Home Depot in Olathe, Kansas, on February 8, 1999.  At that time she was interviewed by Jerry Camacho and Kerry Utz, the store manager and operations manager, respectively.  During the interview, they emphasized that Home Depot wanted loyal, long-term employees, that Home Depot provided career development and advancement, and that plaintiff could

very possibly retire from Home Depot.  Although no one promised her permanent employment during the interview, plaintiff's impression was that that was the case.

R.D. Kuntz was plaintiff's orientation trainer at the beginning of her career with Home Depot.  Plaintiff's Dep., Exh. A, at 39.  He covered thoroughly the disciplinary process that Home Depot had in place.  *Id.*  He represented that unless some major violation occurred, there was a disciplinary process that was used because Home Depot's employees were the most important thing and it was Home Depot's goal to keep them.  *Id.* at 39-40.

After plaintiff transferred to Store # 2204 in Wichita in 2002 and had worked there for over a year, she was interviewed by Eli Jantz for employment as a scheduler with Home Depot.  During the interview, plaintiff told Jantz she was interested in longevity and wanted to retire from Home Depot.  Jantz said he saw no problem with her holding that position for as long as she wanted it and the position was there.  Plaintiff's Dep., Exh. A, at 31.

At the initial orientation, Roger Nix, the district manager for the Kansas City region, welcomed everyone and talked about long-term career opportunities, development, and keeping employees.  *Id.* at 43.  He stressed longevity and the three-step discipline process.  *Id.* at 44. Plaintiff understood this as a promise that she could not be terminated from Home Depot unless she was afforded the three-step discipline.  *Id.*

When plaintiff trained as a head cashier, her understanding was that if there was discipline to be imposed, the three-step process needed to be followed.  *Id.* at 48.  The trainer emphasized the importance of following the discipline process.  *Id.* at 49.  The following answers were given by plaintiff in her deposition when defense counsel attempted to ascertain whether any Home Depot manager ever promised her she would not be terminated without the three-step discipline:

Q.  During the head cashier training, did anyone specifically say to you, "Tammy, you will never be terminated unless and until you receive three-step discipline?"

A.  In that training, they covered the three-step disciplinary process, and they emphasized the importance of following it.  And I was in that class, so yes, it was directed towards me.

Q.  Have you ever had a one-on-one conversation with any member of Home Depot management in which someone specifically says words to the effect "Tammy, you will never be terminated or fired unless or until you receive three-step discipline?"

A.  I don't recall ever being in any position that somebody deemed it necessary to threaten my job, no.

Q.  Had you ever been in a conversation with any member of Home Depot management, though, in which someone promised you or represented to you that you would never be terminated unless or until you were disciplined three times?

A.  It had been represented to me on those occasions that I've already mentioned.

Plaintiff's Dep., Exh. A, at 49.

The occasions "already mentioned" referred to the foregoing orientation sessions with R.D. Kuntz and Roger Nix and statements by Eli Jantz and Bill Polzin.  Plaintiff's Dep., Exh. A, at 50. Plaintiff explained that in one instance where Polzin was required to make a reduction-in-force, he was angry with his assistant managers because they had failed to document bad performance by some associates, and Polzin said as a result he couldn't get rid of the bad employees and keep the good ones because there was no documentation.  He said he had to get rid of the good ones because they were hired last.  *Id.* at 59.  At other times when there was a problem associate, and Polzin would have Jantz pull the employee's file, if there was no previous documentation in there Polzin would say that his hands were tied and that he could not do anything about the complaints if his managers were not willing to document incidents.  *Id.* at 61.  Polzin would say that they had to have prior documentation before they could terminate someone.  Plaintiff's Dep., Supp. Exh. A, at 37.

II.  *Defendant's Motion for Summary Judgment*.

Defendant Home Depot first argues plaintiff has failed to cite evidence of the existence of an implied contract.  It contends that statements by Home Depot managers unrelated to plaintiff's interviews for employment or related to her promotion are not relevant and do not show an implied

contract with plaintiff.  It argues that plaintiff is relying on vague statements by Home Depot about

its intention of retaining employees, its explanation of the company's three-step discipline process,

or statements by managers that documentation was needed to terminate other associates, but these

statements were not directed at plaintiff and in any event do not establish an implied contract.  Home

Depot claims that the mere fact it adopted a disciplinary policy and informed its employees about

it does not manifest an intent to be contractually bound by it.  It argues that plaintiff's claim to be

contractually entitled to the discipline process is based on her unilateral assumption that she was

guaranteed continued employment, and that such a unilateral expectation is an insufficient basis for

an implied contract.

　　　　Defendant contends the implied contract claim fails for other reasons as well.  It asserts that

there was no "mutuality" to support a contract because Home Depot employees could quit at any

time, which it believes is inconsistent with a claim of contract for continued employment.   It

contends the claim fails for lack of consideration, because no additional consideration was provided

to support such an agreement.  It argues that the statute of frauds also bars plaintiff's claim, because

there was no written agreement and the purported contract of guaranteed employment until

retirement could not be performed within one year.

　　　　Home Depot argues that plaintiff's claim for retaliatory discharge or wrongful termination

is also precluded as a matter of law for several reasons.  It argues that plaintiff cannot support a

"whistle blower" claim under Kansas law because she did not actually report any wrongdoing, the

matter she allegedly reported on concerned a store policy and not a matter relating to public health,

safety or welfare, and she cannot show that any of the individuals who terminated her had

knowledge of her participation in the investigation.

　　　　Plaintiff contends that she based her understanding that she was a permanent employee on

her initial orientation training, her training classes after being hired, and her numerous conversations with managers over a six-year period.  She argues that all of the written materials she saw emphasized a three-step disciplinary process.      She contends that Home Depot emphasized retention of employees, the career advancement that would be available, and its fair treatment of employees in all areas, including discipline.  Plaintiff contends that the materials "essentially indicate" that unless you do not perform, you will have a job at Home Depot.  Plaintiff acknowledges that the handbook stated that employees were considered at-will, but she argues it is a question of fact for a jury to decide the intent of the parties.

Plaintiff argues the statute of frauds has never been applied in Kansas to defeat an implied contract claim, and that doing so here would work an injustice and fraud.  She also contends the defendant's asserted lack of "mutuality" provides no defense because the evidence shows plaintiff could not quit at any time – she had to give the company notice – and, at any rate, it is a question of fact whether an implied contract was formed.  As for defendant's claim of a lack of consideration, plaintiff argues the more recent case law suggests this is merely one of the circumstances to be considered in determining whether a contract was formed.  Plaintiff also argues there was additional consideration provided for the employment contract in the form of employee benefits.  Plaintiff argues that whether an implied contract exists is a question of fact.

As for the claim of retaliatory discharge, plaintiff claims she was retaliated against by Eli Jantz "for her refusal to perform personal errands for him, both on and off the clock, and for what apparently he perceived as interference in an investigation of management." Doc. 41 at 13.  Plaintiff argues she has a claim either because Home Depot's explanation for the termination was pretextual (*citing Riddle v. Wal-Mart Stores, Inc.*, 998 P.2d 114 (Kan.App. 2000)), or because the court should recognize a claim for breach of the implied obligation of good faith and fair dealing. Doc. 41 at 13.

Plaintiff contends that the termination was retaliatory in nature and a violation of Home Depot's stated policies, and it therefore supports a claim.

III.   _Standards for Summary Judgment_.

The standards and procedures for summary judgment are well established. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*.; Fed.R.Civ.P. 56(c). A principal objective of the summary judgment rule is to isolate and dispose of factually unsupported claims. *Celotex*, 477 U.S. at 323-324. A disputed fact is "material" for purposes of summary judgment if it might affect the outcome of the suit under the governing law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

Under Rule 56, the movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir.1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the non-movant's claim. *Id*. at 671 (*citing Celotex*, 477 U.S. at 325). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co ., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). At this stage of the proceedings, the court must examine the evidence on a motion for summary judgment in the light most favorable to the non-moving party. *Jones v. Unisys Corp*., 54 F.3d 624, 628 (10th Cir.1995).

IV.   _Discussion_.

A. *Implied Contract of Employment.*

Under the common law doctrine of employment-at-will, employment relationships are terminable at the will of either party.  Kansas generally follows this doctrine, such that employment relationships are terminable at the will of either party absent an express or implied contract or where public policy dictates otherwise. *Wells v. Accredo Health Group, Inc.*, 2006 WL 1913140 (D.Kan., Jul. 11, 2006) (*citing  Flenker v. Willamette Indus., Inc*., 967 P.2d 295, 298 (Kan.1988)).

The Kansas courts have recognized that an employer can create an "implied-in-fact" contract based upon representations made in an employment manual or other sources.  *See Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841, 848-49 (1987); *Kastner v. Blue Cross and Blue Shield of Ks., Inc.*, 21 Kan.App.2d 16, 24, 894 P.2d 909, 916 (1995).  "The relevant inquiry in determining whether an implied contract exists is whether the parties intended to enter into an agreement restricting the employer's ability to terminate its employees at will."  *See Emerson v. Boeing Co.*, 1995 WL 265932, *1 (10th Cir.1995).  The understanding and intent of the parties is to be ascertained from several factors, including written and oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced. *Morriss*, 738 P.2d at 848-49.

In *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995), the Tenth Circuit (quoting *Morriss*) noted that this issue is typically a question of fact for a jury.  But this

observation does not preclude the granting of summary judgment in an appropriate case.[2]  As Chief

Judge Lungstrum stated in *Zwygart v. Bd. of County Commr's. Of Jefferson County*, 412 F.Supp.2d

1193, (D. Kan. 2006),  "in order to survive a summary judgment motion, it is incumbent upon the

plaintiff to assert specific facts tending to establish a triable issue concerning whether the parties

possessed the mutual intent to create a legitimate expectation of continued employment."  *Id.*

(*quoting Emerson v. Boeing Co.*, 1995 WL 265932, *1 (10th Cir.1995) (collecting federal cases

applying Kansas law where summary judgment in this context has been affirmed)).  *Cf. Anglemyer*,

58 F.3d at 537 (observing that "the federal courts have been more willing to grant summary

judgment in favor of employers when applying Kansas law.").  In this regard, the cases are uniform

in holding that summary judgment is appropriate if the plaintiff presents only evidence of her own

unilateral expectations of continued employment.  *Kastner*, 894 P.2d at 916.

When  plaintiff  formed  her  employment  relationship  with  Home  Depot,  she  signed  an

Acknowledgment Form stating that she understood the employment would be for no definite term,

that she had the right to terminate employment at any time at her convenience, with or without cause

or reason, and that Home Depot had the same right.  She further acknowledged that this status "can

only be modified if such modification is in writing and signed by both me and the President of the

Company."  *Cf. Morriss*, 738 P.2d at 849 ("It has not been established that the disclaimer was

brought to the personal attention of its employees...").  "It is well established that disclaimers of this

---

[2] The observation that this issue is "typically" for a jury or that summary judgment is
"rarely granted" does not, insofar as this court understands it, establish a rule of law to be
applied in such cases.  The legal standard to be applied is whether there is evidence in the record
from which a reasonable jury could find in the plaintiff's favor on all the elements of a claim,
including the requirement that there be some objective evidence manifesting the employer's
intent to enter an agreement restricting its ability to terminate employees at will.  *See Kastner v.
Blue Cross and Blue Shield of Ks., Inc.*, 894 P.2d 909, 918 (Kan. App. 1995) (plaintiff "has
failed to come forward with evidence to establish a material issue of fact regarding the intent of
the parties to form an implied-in-fact contract of employment.").

nature are probative of whether an implied employment contract was formed; however, the disclaimer does not, as a matter of law, always determine the issue." *Conrad v. Bd. of Johnson County Com'rs.*, 237 F.Supp.2d 1204, 1258 (D. Kan. 2002). "For the disclaimer to be determinative, the evidence must show that the plaintiff actually read the disclaimer or that it was otherwise brought to the plaintiff's attention" and "the disclaimer must not be inconsistent with statements made by the defendant to its employees." *Id.* In *Henderson v. Montgomery County Bd. of County Com'rs.*, 213 F.Supp.2d 1262, 1278 (D. Kan. 2002), where it was undisputed that the plaintiff had been informed of the disclaimer (as it is here), the court found that such facts "severely undercut the merits of the plaintiff's claim." And in *Kastner v. Blue Cross and Blue Shield of Ks., Inc.*, 894 P.2d 909, 919 (Kan. App. 1995), the court found that a disclaimer read by the plaintiff "makes clear that [defendant] did not intend to form a contract with [plaintiff]."

Plaintiff claims an implied contract was nevertheless formed because Home Depot had policies and made statements that were inconsistent with employment at will. Plaintiff relies heavily on the fact that Home Depot emphasized a policy of progressive discipline both when she was hired and throughout her employment. A company's adoption or use of a progressive discipline policy, in and of itself, is not necessarily inconsistent with reserving a right to terminate employment at will. Only where the employer makes some representation or takes some action inconsistent with employment at will – such as by promising employees that they cannot be terminated except pursuant to the progressive discipline policy – can it be said that such a policy contradicts a statement that the employment is at will. Thus, in *Wells v. Accredo Health Group, Inc.*, 2006 WL 1913140 (D. Kan., Jul. 11, 2006), the court granted summary judgment notwithstanding a progressive discipline policy in the company manual because nothing in that policy was inconsistent with employment at will. In this instance, plaintiff has likewise failed to cite evidence that Home

Depot represented to her that she could not be terminated except for "just cause" under the three-step discipline process. Plaintiff points out that Home Depot emphasized the importance of the discipline process in its orientation, but she provides no evidence of any representation by Home Depot that it did not have the right to terminate her employment for any reason *Cf. Kastner*, 894 P.2d at 917 ("[t]elling an employee about certain grounds for termination is not the same as telling an employee that he or she will not be terminated absent those grounds."). In her deposition testimony, plaintiff repeatedly asserted her understanding that employees could not be fired without cause, but her subjective understanding of Home Depot's intent is not sufficient to establish an implied contract. *Emerson v. Boeing Co.*, 1995 WL 265932, *1 (10th Cir.1995) (employee's subjective expectation of continued employment is not enough). The 1999 Orientation Guide for new associates specifically provided a section on employment at-will, which stated that both employees and Home Depot could terminate employment at any time and with or without cause." This unambiguous statement is not incompatible with the accompanying description of a disciplinary process under which "Home Depot believes that, where possible, associates should be given the opportunity to improve performance...." Nor does a general practice of only firing employees based upon good cause constitute proof that the company does not maintain an at-will employment policy. If it did, employers would have an incentive "to occasionally fire employees for no other reason than to show that they maintain the freedom to do so." *See Burke v. BDM Technologies, Inc.,* 1999 WL 40973, * 3 (10th Cir., Feb. 1, 1999). Thus, evidence that managers in plaintiff's presence said (after she was hired) that under company policy they needed "documentation" to fire workers does not constitute sufficient evidence of an implied contract to support a claim. *Cf. Zwygart v. Bd. of County Com'rs. Of Jefferson County*, 412 F.Supp.1193, 1200 (D. Kan. 2006) ("The Kansas rule remains that an employment manual, that is only a unilateral expression of a company policy and is not bargained

for, cannot alone be the basis of an employment contract.") [citation omitted]. Nor does talk about

career opportunities or comments by a manager that he saw no reason why plaintiff could not stay

in her position until she retired constitute evidence of a contract not to terminate plaintiff without

cause. Such representations are not inconsistent with "an indefinite hiring terminable at the will of

either party." *Ney v. City of Hoisington, Ks.*, 2007 WL 608263, *11 (D. Kan., Feb. 22, 2007).

In order to survive summary judgment on an implied contract claim, a plaintiff must show

more than her own unilateral expectation of continued employment. *Conyers v. Safelite Glass Corp.*,

825 F.Supp. 974, 977 (D.Kan.1993). She must show the parties had a *mutual* intent to create a

legitimate expectation of continued employment. *See id.* On this record, plaintiff has failed to cite

evidence showing Home Depot's intent to enter an agreement restricting its ability to terminate its

employees at will. For this reason, the court concludes defendant is entitled to summary judgment

on plaintiff's claim for breach an implied contract of employment.

B. *Retaliatory Discharge*.

Plaintiff's complaint alleges in part that Home Depot breached an implied contract of

employment by wrongfully terminating employment her without cause. As indicated above, the

court rejects the claim that there was an implied contract between the parties. Plaintiff's complaint

and the Pretrial Order also appear to assert a claim for "retaliatory discharge," which is based on

allegations that plaintiff was terminated in retaliation for assisting the company's District Loss

Prevention Manager, Lynn Mead, with an investigation of the conduct of several company

managers.[3]

---

[3] Plaintiff's Response to the motion for Summary Judgment does not appear to rely on the whistleblower exception. *See* Doc. 41 at 13. Rather, it argues that the termination was in violation of an implied contract or in violation of an implied obligation of good faith and fair dealing. The first of these arguments, however, is precluded by the court's ruling above that plaintiff has failed to cite evidence showing the existence of an implied contract, and the second

Kansas law recognizes an exception to the rule of at-will employment in cases of unlawful termination for "whistleblowing."  Under this exception, a plaintiff establishes a prima facie case of retaliation for whistleblowing by showing that: (1) a reasonably prudent person would have concluded that plaintiff's co-worker or employer was violating rules, regulations or the law pertaining to public health, safety and general welfare; (2) the whistleblowing was done in good faith based on a concern regarding that wrongful activity, rather than a corrupt motive like malice, spite, jealousy or personal gain; (3) the employer knew of the employee's report before it discharged the employee; and (4) defendant discharged the employee in retaliation for making the report.  *See Goodman v. Wesley Med. Ctr., L.L.C.*, 276 Kan. 586, 589-90, 78 P.3d 817, 821 (2003) (*citing Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685, 689-90 (1988)).

The evidence cited by plaintiff on summary judgment fails to establish at least one of the essential elements of a claim for whistleblowing.  The protection afforded by this policy exception extends only to the reporting of matters related to public health, safety or welfare.  *See Palmer*, 752 P.2d at 689 ("Public policy requires that citizens in a democracy be protected from reprisals for performing their civil duty of reporting infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare.").  It would not extend to merely reporting suspected failures to comply with internal company policies or procedures unrelated to such laws.  *See Aiken v. The Business and Industry Health Group, Inc.*, 886 F.Supp. 1565, 1573 (D. Kan. 1995) (complaint about the way patients were treated failed to establish whistleblower claim; plaintiff failed to show that his actions were in furtherance of a clear mandate of Kansas public policy).  Plaintiff has failed to cite any evidence showing that her alleged whistleblowing pertained to any serious violation of

---

argument was rejected by the Kansas Supreme Court in *Morriss v. Coleman Co.*, 738 P.2d 841 (Kan. 1987).

rules or laws affecting public health, safety or welfare.   Accordingly, her claim of unlawful retaliatory discharge fails as a matter of law.

     V.  *Conclusion*.

     Defendant Home Depot's Motion for Summary Judgment (Doc. 33) is GRANTED.  Plaintiff shall take nothing on her claims, and the action is hereby dismissed on the merits.  Plaintiff's Motion to Amend the Complaint to add a claim for punitive damages (Doc. 32) is DENIED as moot.  The Clerk is directed to enter judgment accordingly.

     IT IS SO ORDERED this   19th   Day of March, 2007, at Wichita, Ks.


            s/Wesley E. Brown
            Wesley E. Brown
            U.S. Senior District Judge